## THE ANITA BERWIND.

(District Court, E. D. Pennsylvania. March 29, 1901.)

### No. 53.

SHIPPING—NEGLIGENCE OF VESSEL—BREAKING OF SUBMARINE CABLE.

The American barkentine Anita Berwind, loaded with coal, was anchored near Port au Prince, in the bay of Hayti, under the direction of a government pilot. Afterwards the pilot came on board to move the vessel to another anchorage. On attempting to raise the anchor, it was found to be fouled with what was supposed to be a wire rope, but was in fact libelant's submarine telegraph cable, and in attempting to free the anchor the cable was broken. The vessel had never been in that port before, and the cable was not shown on its chart of the bay. The libel charged that the breaking was negligent and intentional. *Held*, that the proof failed to support such allegations, the weight of evidence showing that the vessel was attempting to support the cable, which had not been raised to the surface, by means of a chain while the anchor could be freed, and that the cable was probably broken across the edge of one of the anchor's palms, owing to the straining of the vessel against it while the work was in progress.

In Admiralty.

J. Warren Coulston, for libelant.
Curtis Tilton, for respondent.

J. B. McPHERSON, District Judge. This is an action for damages growing out of the breaking of libelant's ocean cable in the bay of Hayti, near Port au Prince. The facts are as follows: On November 20, 1896, the American barkentine Anita Berwind, loaded with 900 tons of coal, arrived in the bay of Hayti, and was taken charge of by an official pilot, who assigned her an anchorage berth about two miles from shore. On November 25th, the same pilot, or another similar official, came on board in order to direct the removal of the vessel to an anchorage nearer shore, where her cargo might be more conveniently discharged by lighters. When an effort was made to raise the anchor, the flukes were found to be fouled with a wire rope, as the cable was at first supposed to be, and, in the attempt to free the anchor, the cable was broken. It is upon the negligence of the vessel in attempting to get the anchor loose that the libelant's case rests, and to this point, therefore, attention should first be directed. The alleged negligence is thus described in the libel:

"The said telegraph cable, with ordinary skill, care, and management of the master and crew of said vessel, might and could have been easily got clear of the said anchor without any damage being done to the said cable, or to said anchor, or to said vessel; but the master and officers of said vessel, on seeing the cable so fouled with said anchor, attempted to free and clear the same, and, in so doing, so negligently, recklessly, and wrongfully conducted themselves that the said master ordered and directed that said cable should be cut and broken in two, and so rigged and used a chain or ring stopper by passing the same under said cable, and making the same fast on board said vessel, that the said chain or ring stopper acted as a saw or file upon said cable, which was kept taut, and by force applied from the donkey engine of said vessel, and by the crew of the said vessel, to said chain or ring stopper, which acted as a saw or file, as aforesaid, upon said cable, the cover-

107 F.—46

ing and wires of said cable were cut, parted, and broken, and the said cable was completely severed, and thereupon, with the sanction and under the direction of the master and officers of said vessel, the said severed parts of said cable were allowed to fall and drop into the bay of Hayti, in about twenty fathoms of water."

There is no sufficient evidence that the master ordered the cable to be cut or broken, and the two subjects for consideration therefore are whether the use of the chain was the cause of the break, and, if so, whether the use was negligent. The libelant's case rests wholly upon the testimony of two of the Berwind's crew, and I have accordingly examined carefully their account of the transaction. My conclusion is that what they say is in essential particulars so discredited by undeniable facts that it cannot be safely relied upon. For example, the photographs of the vessel and other testimony do not permit me to doubt that the flukes of the anchor must have been under water while the work of freeing the ship was in progress, although the witness Varlack swears that the flukes were so far above the surface that the bow of a boat could, and did, pass underneath. So with regard to the witness Roseman. His testimony implies that he saw everything that took place, but I have no hesitation in finding that, for at least a considerable part of the time that was occupied in the work, he was at the winch, where he could see nothing of what was being done upon the surface of the water immediately under the starboard bow. It is impossible, I think, to rely on these witnesses, and without their testimony the libelant has no case.

In a few words, I regard the following facts as established: The ship was upon her first voyage to Port au Prince, and knew nothing about that harbor except what might be learned from a chart 10 years old, upon which the cable did not appear. The course of the cable, which was laid in the channel, and not in the shallower water nearer the shore, was not marked by buoys, or indicated in any other way. The anchorage ground was chosen for the Berwind by a government pilot, and not by the vessel itself. The attempt to raise the anchor was made at the direction of the pilot, but it does not clearly appear, and it is not important to determine, whether the subsequent effort to free the anchor from the cable was carried out under the orders of the pilot or of the master. It was not known on the ship that the wire rope with which the anchor was fouled was a cable until after it parted, as the flukes of the anchor were under water, and the cable could only be seen occasionally, and not always with distinctness. The effort of the ship was to support the cable on either side of the anchor, so that the anchor might be dropped free, and this maneuver was tried two or three times, the supports being of rope. The strain on the ropes was great, owing to the fact that the ship was being held in place by the cable, and that there was some additional, but necessary, strain, due to the fact that the two topsails that had been properly set on the foremast were feeling the force of a light wind. It was in consequence of this strain that the ropes broke. Thereupon a chain was brought into use, fastened at one end to the

starboard cathead, from this point underrunning the cable, and attached at the other end to a rope that was carried to the winch of the donkey engine. When power was applied to the winch, the links of the chain were necessarily drawn across the cable, perhaps for two or three feet. But there is no satisfactory evidence that there was any sawing motion given to the chain, or that the chain was in such a condition that, in any event, it could have worn the cable through by so brief an attrition. On the contrary, I think the fact is that the cable broke at the edge of one of the anchor's palms, and that the breaking was due to the straining of the vessel's weight against this comparatively sharp metal edge.

I see no evidence of negligence upon the part of the vessel, and since upon this ground alone the libel must be dismissed it is unnecessary to consider the other defenses set up by the respondent. A decree may be entered dismissing the libel, with costs.